Robert Starr (183052)
robert@starrlaw.com
Adam Rose (210880)
adam@starrlaw.com
Law Office of Robert Starr
23622 Calabasas Rd., #320
Calabasas, CA 91302
Telephone: (818) 225-9040
Facsimile: (818) 225-9042

Roy Aviram (330824)
roy@aviramlaw.com
Aviram Law
23622 Calabasas Rd., #321
Calabasas, CA 91302
Telephone: (310) 388-3488
Facsimile: (310) 388-9988

Attorney for Plaintiff
Ray Myllyla

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAY MYLLYLA, individually and on behalf of all similarly situated individuals,<br><br>Plaintiff,<br>v.<br><br>EQUITY RESIDENTIAL MANAGEMENT, L.L.C., and DOES 1 to 10,<br><br>Defendants. | NO. 2:25-cv-10784-SSC<br>CLASS ACTION<br><br>SECOND AMENDED COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW |

PRELIMINARY ALLEGATIONS

1. The court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

2. Venue is proper in the Central District since the property where Plaintiff rents is in Woodland Hills at 6150 DeSoto Avenue.

3. Plaintiff Ray Myllyla is a resident of Los Angeles County and has been Defendants' tenant since February 27, 2025.

4. Defendant Equity Residential Management, L.L.C. is a Delaware limited liability company based in Illinois, and is qualified to do business in California.

5. Plaintiff does not know the true names and capacities of Does 1 to 10 and uses fictitious names. Plaintiff will amend the complaint pursuant to Federal Rule of Civil Procedure 15 to allege the true names and capacities when ascertained.

6. The named and Doe defendants are collectively referred to as "Defendants."

7. Plaintiff is informed and believes that each of the Defendants was the agent or employee of the other defendants and acted in the scope of agency or employment.

8. Defendants operate hundreds of apartment complexes throughout the state.

9. The business practices described below are uniform for Defendants' leases, and therefore the necessary prerequisites for a class action can be met.

<u>THE EXTRA FEES WERE NOT DISCLOSED IN THE ADVERTISED PRICE</u>

10. As explained detail below, Plaintiff and the class members were assessed millions of dollars of fees by Defendants for items that are not related to tenancies.

11. The first category of extra monthly fees that should not have been assessed are for pest control.

12. There is no need for monthly pest control fees, since the landlord complies with the warranty of habitability on an as needed basis when they are notified of a rodent/vermin issue. Cal. Civ. Code, §§ 1941, 1941.1.

13. Thus, it is impractical and even wasteful to spend so much money on monthly pest control, and it is unfair and fraudulent to pass on these fees to Plaintiff and the class members.

14. The other category of contested monthly fees are for trash administration.

15. Nearly all tenancies have the tenants pay for trash collection, since it is a utility incident to the possession.

16. However, there is nothing that permits a landlord or management company to charge tenants a running monthly amount just to maintain contact with the utility.

17. These extra monthly fees were not advertised as part of the rent.

18. These hidden fees, which are sometimes referred to as junk fees or drip pricing, were not disclosed to tenants until after they started the leasing process.

19. After attracting prospective tenants with deceptively low prices, Defendants continue to misrepresent the true cost of renting a unit on the rental websites.

20. Defendants do not disclose the hidden fees until they pay to apply, or only after they opened an account.

21. Defendants also did not disclose the hidden fees until after tenants selected a floor plan, and even then the hidden fees were concealed behind hyperlinks.

22. Even on webpages where Defendants now list hidden fees before tenants apply, the fee information is confusing and contradicts other information on the online ad, and the advertised price still excludes the hidden fees.

23. Tenants have limited options for recourse. If a tenant finds out the true price before signing a lease, they are unable to recoup the application fee. If a tenant who already signed, Defendants charge a cancellation fee.

24. The deceptive and false advertising translate to hundreds or even thousands of dollars of hidden fees.

25. Defendants do not state in the advertised price that on top of the advertised amount, tenants must pay the hidden fees.

## OVERVIEW OF RENTAL AGREEMENTS

26. Preliminarily, an enforceable rental agreement must be supported by mutual consideration. Cal. Civ. Code, § 1550(4).

27. The tenant's consideration is to pay rent and the return consideration from the landlord is granting of exclusive use/possession for the rental period. *Smith v. State Bd. of Equalization of State of Calif.*, 53 Cal.App.4th 331, fn. 5 (1997).

28. Consequently, rent can only cover possession of the unit. Rent does not include superfluous, additional fees that have nothing to do with possession.

29. Possession is a critical concept in the landlord tenant realm and it means exclusive against all the world including the owner. *San Jose Parking, Inc. v. Superior Court*, 110 Cal.App.4th 1321, 1328 (2003).

30. This is because a rental agreement or lease transfers possessory rights: The landlord retains fee title to the leased premises, and the tenant acquires the right to exclusive use and possession during the lease term. Upon termination of the tenancy, possession reverts to the landlord. *Avalon Pacific-Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC*, 192 Cal.App.4th 1183, 1190 (2011).

31. A landlord cannot require a tenant to pay for any other fees over the rental price unless permitted by statute.

32. For example, a Los Angeles City landlord may require a tenant to pay a monthly SCEP (systematic code enforcement) fee in addition to rent, only if the landlord gives notice to the tenant as required by Rent Adjustment Commission Guideline 370.00.

## NO REQUIRED DISCLOSURES FOR PEST CONTROL

33. Defendants in this case did not give any of the required disclosures to charge Plaintiff and the class members for pest control and trash administration.

34. California Civil Code 1940.8 requires landlords to provide each new tenant that occupies the unit with a copy of the notice provided by a registered structural pest control company pursuant to Section 8538 of the Business and Professions Code, if a contract for periodic pest control service has been executed.

35. Defendants presumably have a contract with a pest control company since Defendants are charging Plaintiff and the class members monthly for pest control.

36. However, Defendants never provided any type of notice to Plaintiff and the class members about their pest control contract.

37. Further, Defendants were not permitted to pass on the pest control fees to Plaintiff and the class since it is not rent.

38. California Civil Code 1942.1 does not give a landlord a carte blanche to add fees to a lease; all this statute does is confirm that as part consideration for the rental, the tenant may agree to repair, improve or maintain the premises themselves.

39. Defendants' leases with Plaintiff and the class members do not contain a provision with an explicit provision to pay for ongoing pest control.

40. The addition of pest control fees in Plaintiff's and the class members' leases contains no consideration for passing on pest control fees by Defendants.

41. Indeed, Civil Code 1942.1 says the tenant can agree to maintain the premises; this means that the tenant must be the one with a contract with a pest control or any other type of maintenance company – not the landlord.

42. Consequently, there is no statute or theory that would allow Defendants to add monthly pest control fees to the rent.

## THE PEST CONTROL FEES ARE UNFAIR UNDER THE UCL

43. Since there is no basis for Defendants to add the monthly pest control fees, it is unfair to charge the monthly pest control fees to Plaintiff and the class members.

44. Also, it is unfair for Defendants to assess monthly pest control fees to Plaintiff and the class members when they are not told about the fees until the lease is ready.

45. When Defendants advertise their available units, the advertised rent price does not include the monthly pest control fees.

46. It is only when the lease is presented to a tenant to sign that the monthly pest control fees are even capable of apprising, and even then the rental staff does not explain that tenants will have pest control fees added to the monthly rent.

47. Instead of advertising and charging tenants a single amount for rent, Defendants break down the amount that tenants pay into smaller amounts such as by charging an amount labeled rent plus fees.

48. Under all three tests for the unfairness prong of the UCL, the pest control fees are unfair.

PEST CONTROL FEES ARE UNFAIR UNDER THE BALANCING TEST

49. For the first test, the "balancing test approach," the court weighs the utility of the defendant's conduct against the gravity of the harm to the alleged victim. *Nationwide Biweekly Administration, Inc. v. Superior Court*, 9 Cal.5th 279 (2020).

50. There is no utility to the monthly pest control fees since to comply with the warranty of habitability, the landlord addresses concerns when the landlord is notified of a problem.

51. A landlord is not expected to act until the landlord is made aware of a habitability issue. *Peterson v. Superior Court*, 10 Cal.4th 1185, 1205-1206 (1995).

52. It follows there is no reason to assess monthly pest control fees since there is no reason there are pest control issues every single month.

53. If the pest control companies that Defendant uses are that incapable of halting a proliferation of pests and vermin that they must come and/or bill every single month, then the pest control companies are not worth it at all.

54. The gravity of harm to the class is quite substantial, as Defendants have conceded in both the notice of removal and in the opposition to the motion to remand that the monthly pest control fees is in the seven figures.

55. This means the tenants are paying millions for pest control that is not even having an effect. The purpose of keeping a building free from vermin is that a landlord must "repair all subsequent dilapidations." *Knight v. Hallsthammar*, 29 Cal.3d 46, 53 (1981), citing Cal. Civ. Code, § 1941.

56. Once the repair is made, the obligation to repair ends, since if the landlord does not repair the issue the tenant can make a deduction from rent until the condition is fixed. Cal. Civ. Code, § 1942.

57. So, Plaintiff and the class members are paying millions for pest control that is not even useful. This means there is no utility to Defendants' conduct in charging the pest control fees, yet on the other hand the tenants are paying millions for completely ineffective pest control. Thus, pest control fees are unfair under the balancing test.

PEST CONTROL FEES ARE UNFAIR UNDER THE TETHERING TEST

58. The second test for unfairness under the UCL is the tethering test, where the public policy which is a predicate to the action must be tethered to constitutional, statutory or regulatory provisions. *Graham v. Bank of America, N.A.,* 226 Cal.App.4th 594 (2014).

59. The first statutory policy is the Honest Pricing Law, contained in Cal. Civ. Code, § 1770(a)(29), which states that it is unlawful to advertise, display, or offer a price for a good or service that does not include all mandatory fees or charges.

60. Although CLRA remedies do not apply to residential leases, the statutory policy behind the Honest Pricing Law is part of statewide public policy since the CLRA is a statewide public policy. *America Online, Inc. v. Superior Court*, 91 Cal.App.4th 1, 15 (2001); Cal. Civ. Code, § 1760. Emphasis added.

61. The other statutory provision in the False Advertising Law contained in Business and Professions Code 17500, which provides it is unlawful to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means. including over the Internet, any statement, concerning real or personal property or those services, professional or otherwise, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised.

62. When Defendants advertise availability for open units they do not list the pest control fees and trash administration fees as part of the advertised price and this is fundamentally unfair.

63. Attached as Exhibit A is a screenshot from exemplar apartment listings for the Bella Vista Apartments at www.equityapartments.com. It does not disclose the pest control and trash administration fees as part of the advertised price.

64. Instead, a person must click on the “View Availability” button above the falsely advertised prices.

65. If a person clicks the View Availability button, they are directed to what is attached as Exhibit B.

66. Exhibit B shows available units, but still the falsely advertised price shows to the left of each unit.

67. Then, a person must figure out to click the “What’s my total cost?” button. If a person figures that out, they are then directed to what is attached as Exhibit C.

68. Exhibit C shows a litany of fees that are not part of the advertised price.

69. In the exemplar unit, what is prominently advertised as $2,374 for monthly rent, is actually $2,582 (or more) in rent. This is a difference of $208 a month.

70. For just one person, that adds up to an additional $2,496, which is nearly equivalent to one month of the advertised rent.

71. The Legislature used sweeping language in consumer protection statutes for the purpose of allowing the courts to deal with the innumerable new schemes which the fertility of man's invention would contrive. *Sharpe v. Puritan’s Pride, Inc*., 466 F.Supp.3d 1066 (N.D. Cal. 2020).

72. Consequently under the tethering test of the UCL, the false advertising prohibited under the statewide public policies of both the FAL and CLRA lead to the conclusion that charging tenants for monthly pest control is unfair.

## PEST CONTROL FEES ARE UNFAIR UNDER THE FTC TEST

73. Under the third test, the FTC test, business practices are unfair if: (1) the consumer injury is substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that

consumers could not reasonably have avoided. *Durell v. Sharp Healthcare*, 183 Cal.App.4th 1350 (2010).

74. Defendants' decision to add the pest control fees to the advertised rent is unfair under the FTC test also, as explained below.

75. First, the consumer injury is substantial since as stated in the declaration of Jenay Carnley in support of both the notice of removal and the opposition to the motion to remand state the amount in controversy exceeds $5 million – this is a substantial injury.

76. Second, the pest control fees serve no tangible or theoretical benefits to consumers. As stated above, pest control is provided on an as needed basis pursuant to the warranty of habitability. Therefore, it is improvident to charge the additional pest control fees.

77. Third, the pest control fees could not reasonably have been avoided.

78. Defendants operate a large-scale housing business. They must be aware of the difficulties consumers face with the housing market.

79. In fact, the State of California, through the Department of Housing and Community Development, "Increased inequality and lack of opportunities: Lack of supply and rising costs are compounding growing inequality and limiting advancement opportunities for younger Californians. Without intervention, much of the new housing growth is expected to be focused in areas where fewer jobs are available to the families that live there." https://www.hcd.ca.gov/policy-and-research/addressing-variety-housing-challenges.

80. Therefore, only extremely wealthy and/or privileged people would have the luxury of discretion to turn down an apartment when the landlord imposes monthly pest control fees on top of the advertised rent.

81. The reality of the housing market, which Defendants must be keenly aware of, depends on pricing units in a way to attract tenants who cannot afford houses, and this is why they advertise artificially low rents.

82. Defendants' position that a tenant could just not sign a lease after the additional monthly pest control fees are set forth does not reflect any type of reality.

83. Just within Los Angeles County alone, there is a documented and entrenched housing shortage.

84. A typical renter does not have the luxury of turning down an apartment on principle for hidden monthly fees, as the housing market is just too tight.

85. So, injury caused by the hidden pest control fees could not reasonably be avoided as the housing market is too limited and challenging.

86. Defendants must know that the housing market is limited and challenging, and that is why they engage in the unfair business practice of charging unnecessary and superfluous monthly pest control fees.

87. It follows that the pest control fees are also unfair under the FTC test.

88. Since the pest control fees are unfair under all three UCL tests (i.e., the balancing test, the tethering test, and the FTC test), imposing the monthly pest control fees qualifies for UCL remedies.

## THE TRASH ADMINISTRATION FEES ARE UNFAIR UNDER THE UCL

89. The same analysis applies to the trash administration fees.

90. A landlord can require a tenant to pay for local utility charges, such as gas, electricity, and trash as they relate to possession of the unit.

91. However, a landlord cannot charge a monthly trash administration charge over and above trash collection.

92. Essentially, Defendants are charging extra just to interact with whichever company or utility is picking up the trash.

93. The already assessed trash collection fee should cover all necessary costs to pick up trash; there is no need for an extra monthly administration fee just to interact with the trash company.

94. Thus, the trash administration fee is simply a fictional charge.

95. Utilities such as trash collection already have set rates which already include customer interactions as they provide a service.

96. There is no need to impose addition trash administration fees, as Defendants do not, and cannot, incur any extra fees for interacting with utilities.

97. Assessing trash administration fees is unfair under all three UCL tests.

## TRASH ADMINISTRATION FEES ARE UNFAIR UNDER ALL THREE TESTS

98. The trash administration fees are unfair under the balancing test since the trash administration fees serve no purpose whatsoever, but tenants are paying millions for this totally unnecessary line item.

99. The trash administration fees are also unfair under the tethering test, since the fees were not disclosed as part of the advertised price.

100. Therefore, the trash administration fees are junk fees since they were not disclosed as part of the advertised rent price.

101. As stated above, there is a statewide public policy under both the False Advertising Law and the Honest Pricing Law that businesses should not advertise without disclosing the true entire price.

102. Finally, under the FTC test the trash administration fees are unfair since they serve no purpose, cost tenants millions of dollars, and given the state of housing it is not something that can be reasonably avoided.

103. Since both the pest control and trash administration fees are unfair under all three tests, the next section discusses how the fees are also fraudulent.

## THE HIDDEN FEES ARE FRAUDULENT UNDER THE UCL

104. A fraudulent business practice under the UCL is likely to deceive members of the public. *Morgan v. AT&T Wireless Services, Inc.*, 177 Cal.App.4th 1235 (2009).

105. The fraudulent prong incorporates by reference the False Advertising Law, and a violation of the UCL's fraud prong is ordinarily also a violation of the False

Advertising Law. *In re Tobacco II Cases*, 46 Cal.4th 298 (2009).

106. The elements of fraud are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity; (c) intent to defraud; (d) justifiable reliance; and (e) resulting damage. *Engalla v. Permanente Med. Group, Inc.*, 15 Cal.4th 951 (1997).

107. For both the pest control and trash administration fees, they are likely to deceive the public.

## PLAINTIFF'S EXPERIENCE WITH THE FRAUD

108. For Plaintiff, the misrepresentation started when he was looking for a rental on apartments.com.

109. The advertised price on apartments.com was $2,586. Attached as Exhibit D is the term sheet from apartments.com showing the base rent.

110. Plaintiff went to the building to look at units in February 2025 and initially met with Cheyenne Lowden, a renting agent.

111. Cheyenne Lowden showed Plaintiff around the building and an available unit.

112. Cheyenne Lowden did not say anything about extra monthly charges for pest control or trash administration; rather she said that in general there would be utility charges, which is typical for nearly all tenants.

113. Plaintiff was then directed to finalize the lease with agent Amaya Machiels.

114. Plaintiff was provided with the lease term sheet in Exhibit D projected that the extra fees would be $2,668.83, but when Plaintiff received statements from Conservice (the utility provider), the amounts were noticeably greater.

115. Attached as Exhibit E are statements from Conservice showing the excessive monthly hidden fee charges.

116. Plaintiff asked Amaya Michiels in person after receiving the first statement from Conservice about the monthly charges, as they were not fully disclosed to him when he finalized the lease with Amaya Machiels.

117. Ms. Machiels responded that the utilities were more expensive than she originally thought.

118. Plaintiff saw in the Conservice statements that he was being charged for monthly pest control and trash administration on top of trash collection, items which were not part of the advertised rent price.

119. Plaintiff's bait and switch experience is common to thousands upon thousands of other Equity tenants, who are lured by artificially low rent prices advertised online, and then when the tenants apply all the extra fees are added.

120. In sum, there was a misrepresentation to Plaintiff, which was the falsely advertised rent price.

121. Defendants knew the apartment's advertised price did not include all monthly fees that Plaintiff would have to pay.

122. Defendants intended to defraud Plaintiff because they wanted to him to believe the advertised price was the true price to lure him to rent, but they planned to make him pay for all the hidden fees once he chose to rent.

123. Plaintiff justifiably relied on the falsely advertised price since he wanted to live in the area, and the advertised price was in the range he was considering.

124. There was resulting damage since Plaintiff has paid more every month than the apartment's advertised price.

125. Thus, the hidden fees are fraudulent as they are false advertising under the FAL and members of the public are deceived by the false advertising.

## THERE ARE COMPARABLE CASES WITH VERY SIMILAR FACTS

126. The Federal Trade Commission has entered into settlements with other large apartment operators for the exact same thing, and it is not prejudicial that the settlements were in other states.

127. Each state has its own consumer protection laws, and in fact they are not as broad as the UCL.

128. So, if other apartment operators have essentially admitted it is wrong to falsely advertise rent prices, the same concept applies here.

129. The Equity case is not an anomaly. Rather, it is on all fours with the FTC settlements, which are summarized below.

130. According to the FTC website regarding its case against Invitation Homes for junk fees: *The complaint alleges that Invitation Homes advertised monthly rental rates that failed to include mandatory junk fees that could total more than $1,700 yearly. Consumers looking for rental houses paid nonrefundable fees—including application fees up to $55 and reservation fees up to $500—based on the deceptively advertised rates. Consumers learned that the price would be higher than advertised only when they received a copy of their lease, and sometimes not even until after they signed the lease. These undisclosed fees ranged from "services" such as "smart home" technology and "utility management," to air filter delivery and internet packages.* ***Renters could not opt out of paying these fees.*** *Since 2019, Invitation Homes has collected more than $18 million in application fees alone for deceptively priced houses*. https://www.ftc.gov/news-events/news/press-releases/2024/09/ftc-takes-action-against-invitation-homes-deceiving-renters-charging-junk-fees-withholding-security. Emphasis added.

131. These are the exact same issues as in the Equity case. The FTC settled with Invitation Homes under the FTC Act, which has the similar purpose of the UCL to protect consumers. 15 U.S.C. § 45(a).

132. The FTC also reached a settlement with Greystar for the exact same issue.

133. According to the FTC website on its Greystar case: *Greystar, the nation's largest multi-family rental property manager, has agreed to pay $23 million to the Federal Trade Commission and $1 million to the State of Colorado and stop its deceptive advertising practices to resolve charges that the company misled consumers about monthly rent costs by tacking on hidden fees on top of advertised prices. The proposed order also requires the company to clearly and conspicuously*

*display total monthly leasing prices and mandatory fees. "Greystar misled consumers by advertising low rent prices and then adding mandatory fees at the end of the sales process," said Christopher Mufarrige, Director of the FTC's Bureau of Consumer Protection. "At a time when Americans are struggling to find affordable housing, the FTC is focused on monitoring the housing marketplace to ensure that competitors are meaningfully competing on price and that consumers receive transparent pricing.*" https://www.ftc.gov/news-events/news/press-releases/2025/12/greystar-agrees-pay-24-million-stop-deceptive-advertising-practices-result-ftc-colorado-lawsuit

134. Again, the FTC/Greystar case covers the exact same issues as the Equity case and it staunchly reifies that the hidden fees are unfair and fraudulent.

135. The UCL is sometimes referred to as a "Little FTC Act," and decisions by federal courts construing Section 5 of the FTC Act are more than ordinarily persuasive in guiding the California courts construing the UCL. *People ex rel. Mosk v. National Research Co. of Calif.*, 201 Cal.App.2d 765, 772-773 (1962).

136. Therefore the FTC settlements are persuasive for the Equity case.

## RUBS BILLING FOR THE HIDDEN FEES IS UNFAIR AND DECEPTIVE

137. The pest control and trash administration fees are deceptive, unfair, and fraudulent since they are imposed under a Ratio Utility Billing Service (RUBS).

138. The only purpose of RUBS is for the landlord to charge for utilities where submeters are installed. Cal. Civ. Code, § 1954.216.

139. There is no California statute that allows landlords to use RUBS for any other purpose, such as pest control and trash administration.

140. Water, and perhaps electricity, are the only utilities that use submeters.

141. Typically under a Ratio Utility Billing System, also known as RUBS, the system is used as a method of allocating water and sewer costs to tenants based on physical factors of a dwelling unit, such as square footage or occupancy.

142. Therefore Defendants are mispresenting their alleged authority to charge the extra monthly fees using RUBS, when they are not permitted to use RUBS in this fashion and do not advertise the RUBS fees as part of the rent price.

143. The attempt to use RUBS to justify not disclosing the extra monthly fees further underpins the unfair and fraudulent nature of the extra fees.

144. Also, tenants have no choice to acquiesce to the unfair and fraudulent monthly fees, all done when housing is harder to obtain.

145. It is irrelevant if the lease lists the unfair and fraudulent monthly fees, since the fees were not included in the advertised price.

146. Defendants do not include the improper RUBS fees in the advertised price.

147. Equity knows or should know that price is the most important factor for majority of renters, but Equity omits the improper RUBS fees from the advertised price; renters cannot lease an Equity apartment by paying only the advertised price.

148. After attracting tenants with deceptively low rental prices, Equity continues to misrepresent the true rental cost by not disclosing the improper RUBS fees; the improper RUBS fees are only disclosed after presenting a very long rental agreement to renters, and even then the improper RUBS fees are not explicitly disclosed by the renting personnel.

149. If a tenant wanted to cancel after discovering the true price, then Equity would charge a cancelation fee, meaning tenants are left with no choice but to pay the improper hidden junk fees.

150. Not only are Defendants charging unlawful and unfair junk fees, Defendants are attempting to legitimize this business practice by doing it through the RUBS program, which is specifically designed to be used for apportioning the cost of water and sewer services to tenants.

## UCL REMEDIES APPLY

151. All the monthly hidden fees and RUBS charges for pest control and trash

administration should be refunded pursuant to the Unfair Competition Law, and an injunction should issue to (1) stop Defendants from the assessing the improper RUBS fees; and (2) when disclosing and advertising rental costs to prospective tenants, disclose and advertise the true and complete rental amount.

152. The remedy at law is inadequate for prospective relief since even if RUBS fees were refunded, Defendants would continue to impose fees prospectively.

153. Prospective injunctive relief is available irrespective of the "inadequate remedy at law" standard for retrospective relief. *See, e.g., Gumner v. PepsiCo. Inc.*, No. SACV 23-00332-CJC (KESx), 2023 WL 9019033, at *4 (C.D. Cal. Nov. 29, 2023). Thus, both retrospective and prospective relief are available.

## CLASS ACTION ALLEGATIONS

154. The class is defined as: "All persons who have been tenants of Defendants in California from four years prior to filing the case to the date of certification or judgment, whichever is earlier, and who have been charged a monthly pest control fee and/or a monthly trash service fee."

155. There is a well-defined community of interest, and the proposed class is ascertainable from Defendants' records. Further, the following apply:

a. Numerosity: The members of the class as defined are so numerous that joinder of all class members is impracticable.

b. Commonality: This action involves common questions of law and fact to the class because the action focuses on Defendants' violations of established landlord/tenant principles as alleged herein.

c. Typicality: The claims are typical of the claims of the class. Plaintiff was subjected to the same violations and seeks the same types of damages, restitution, and other relief.

d. Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the class. Plaintiff understands

the obligations as a class representative and is willing and able to fulfill them. Plaintiff's counsel is competent and experienced in litigating class action cases.

e. Superiority of Class Action: A class action is superior to other available means for efficient adjudication. Class action treatment will allow similarly situated persons to pursue the claims in a manner that is most efficient and economical.

156. There are common questions of law and fact including but not limited to:

f. Whether Defendants violated the UCL for the reasons above, including assessing impermissible pest control and trash administration hidden fees and charges.

## FIRST CAUSE OF ACTION

Violation of the Unfair Competition Law

Against All Defendants

157. Plaintiff incorporates by reference paragraphs 1 to 155 of the amended complaint.

158. The Unfair Competition Law prohibits unfair, unlawful, and fraudulent business practices. The unlawful and fraudulent prongs apply as explained below.

159. The UCL is also directed toward the public's right to protection from fraud, deceit, and unlawful conduct. (*Hewlett v. Squaw Valley Ski Corp.* (1997) 54 CA4th 499, 519-520.)

160. Also, the UCL imposes strict liability. It is not necessary to show the defendant intended to injure anyone. (*Community Assisting Recovery, Inc. v. Aegis Security Ins. Co.* (2001) 92 Cal.App.4th 886, 891.)

161. The unfair prong relates to conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law.

162. Defendants also engaged in unfair conduct since they are assessing fees that they cannot do based on the above of the three UCL unfairness tests.

163. Defendants know that rent is the most important factor when choosing a new apartment, but Defendants continue to mislead tenants about the actual cost of renting, inhibiting the ability to accurately comparison shop for different units.

164. In connection with the advertising, marketing, promotion, and offering for lease, Defendants misrepresent that the advertised monthly price is the total monthly amount consumers will pay.

165. However, the advertised price is not the total monthly amount that tenants will pay for an Equity apartment because the advertised price does not include all mandatory monthly fees.

166. It is not relevant that the 50-plus page lease ultimately lists the undisclosed mandatory fees, since the prominently advertised price does not list the hidden fees.

167. Defendants are essentially cornering the market by assessing fees that extend beyond the landlord-tenant relationship which may harm competition. as Defendants are impermissibly passing on their statutory obligations to the tenants and hiding extra fees until it is too late. This practice is also referred to as charging junk fees.

168. The pest control and trash service fees were not part of the advertised rent price, and as stated above they should not have been charged at all.

169. The fraudulent prong of the UCL applies when members of the public are likely to be deceived. *Committee on Children's Television v. General Foods Corp.* (1983) 35 Cal.3d 197, 211.

170. Plaintiff and the class members have been deceived by the hidden fees.

171. A plaintiff may proceed under the fraudulent prong based on a theory of omission if the defendant had a duty to disclose. One circumstance in which such a duty arises is when the defendant makes partial representations but also suppresses some material facts. *LiMandri v. Judkins*, 52 Cal.App.4th 326, 336 (1997). That is exactly what happened with Plaintiff regarding the false advertising.

172. A perfectly true statement that is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information like the hidden fees, is actionable under the UCL. *Day v. AT&T Corp*., 63 Cal.App. 4th 325, 332-33 (1998).

173. There was no opportunity to disclaim the improper hidden fees. This was done at the insistence of Defendants' leasing representatives, Cheyenne Lowden and Amaya Machiels, at the Bella Vista Apartments where Plaintiff is a renter.

174. Plaintiff incurred money losses from the above, so Plaintiff has standing pursuant to Business and Professions Code section 17203, including for restitution and prospective injunctive relief.

175. Plaintiff and the class seek restitution and injunctive relief for all unlawful, fraudulent, and unfair hidden pest control and trash administration charges and fees.

176. Plaintiff is entitled to attorney fees under Cal. Code Civ. Proc. § 1021.5.

PRAYER

For Class Action Allegations

1. Class certification
2. Plaintiff is appointed representative of the class
3. Counsel for Plaintiff are appointed as class counsel

First Cause of Action

1. Reimbursement of all pest control and trash administration charges
2. Prospective injunctive relief
3. Attorney fees
4. Other relief the court deems proper

Date: March 25, 2026

LAW OFFICE OF ROBERT STARR

*/s/ Adam Rose*
Attorney for Plaintiff
Ray Myllyla

# Exhibit A

# Bella Vista At Warner Ridge Apartments

6150 De Soto Avenue Woodland Hills CA 91367

(818) 857-4279

★★★★☆

out of 4440 testimonials

Open today from 10 AM to 6 PM

View Availability

| 1 Bed | 2 Bed | 3 Bed | Shared |
|---|---|---|---|
| $2,100+ | $3,100+ | $3,704+ | $1,550+ |

# Exhibit B

Bella Vista At Warner Ridge Apartments (818) 857-4279 Contact Book Tour Apply

LIVING HERE NEIGHBORHOOD AVAILABILITY TESTIMONIALS OUR TEAM LIVE NEARBY GALLERY

Video

3D Floorplan

$2,374

What's my total cost?

1 Bed / 1 Bath

771 sq. ft. / Floor 1

Available 4/25/2026

The Opus One Floor Plan

This apartment offers an open layout and a large main bedroom. This first floor apartment has a patio that is sitting up on a hill and not at street level.

Renovated Smart Home

Unit In Phase 2 Urban Surface Flooring

Western Exposure

Floorplan




Photos (7)

Video

3D Floorplan

Schedule Tour

Contact

Apply

SEE 14 MORE AVAILABLE 1 BED APARTMENTS

# Exhibit C

# Move-In Charges

## Due At Application

| | |
|---|---|
| Non-Refundable App Fee | $42 |
| Convertible Holding Fee | $200 |

## Due At Lease Start

| | |
|---|---|
| Security Deposit | $600 |
| First Month's Rent<br>Amount may be prorated based on move-in date | $2374 |

# Monthly Charges

## Monthly Apartment Rent

| | |
|---|---|
| Monthly Apartment Rent | $2374 |

## Required Estimated Utilities

Estimated utility amounts shown are based on 12-month trailing average. Actual charges may vary based on usage, season, household size occupancy, square footage, changes in provider vendor, rates and other factors.

| | |
|---|---|
| Water | $76 |
| Sewer | $34 |
| Trash | $61 |
| Utility Admin Fee | $6 |
| Pest | $3 |
| Electric | Paid to Provider |
| Gas | Paid to Provider |

## Required Charges

| | |
|---|---|
| Code Enforcement Program | $3 |
| Reserved Parking | $25 |

# Estimated Monthly Charges $2582

Estimated Monthly Charges does not include additional options.

# Exhibit D

**Guarantor:**



**Occupants:**

**LEASE TERM**

**Commencement Date:** 02/27/2025 **Expiration Date:** 02/26/2026 **Renters' Liability Insurance Required:** Yes

Lease Term Expiration: You must provide us with a written notice of your intent to vacate at least 30 days prior to your move-out date. If you fail to give the required notice, and you move-out anyway, the Lease term will be automatically extended for an additional month after you vacate the Premises and you will be obligated to pay insufficient notice rent to fulfill your notice obligation at the rental rate that is in effect on your move-out date.

**Total Deposits Required:** $600.00

**Total Monthly** Charges : $ 2668.83 **(includes all monthly recurring charges listed below)**

| Charge Description | Amount | Charge Description | Amount | Charge Description | Amount |
|---|---|---|---|---|---|
| Monthly Apartment Rent | 2586.00 | Monthly Reserved Parkin | 30.00 | | |
| Monthly Storage | 50.00 | | | | |
| Code Enforcement Progra | 2.83 | | | | |

**Assigned Item Description**

Rentable Compact Phase III 103
Rentable Compact Phase III 104
Storage Space PH3-78 5x10x8

**Concessions:** Monthly Recurring Concession: $ 15.00 /per month. Total Amount of One-Time/ Non-Recurring Concession: $ 0.00 . Total Amount of Other Recurring Concessions: $0.00 . The Total Monthly Rent shown above will be adjusted by these lease concession amounts. If this Lease is terminated early, you may be required to pay us a portion of your concession as set forth in the Lease Concession paragraph of the Terms and Conditions.

**Total Other Fees and Charges:** $0.00
**(includes all charges listed below)**

| Charge Description | Amount | Charge Description | Amount | Charge Description | Amount |
|---|---|---|---|---|---|

| | Type | Breed | Weight | License/Tag |
|---|---|---|---|---|
| **Approved Pets** | Dog | Frenchie | 0 | |

**For additional information regarding our pet policy, please refer to the Resident Handbook and Community Policies.**

**Resident Account Number:** 29229-210-1012-6



Docusign Envelope ID: D79E33A7-C984-418F-9393-4BD915E9ACBC

**LESSOR PAYS UNCHECKED UTILITIES / RESIDENT PAYS CHECKED UTILITIES**

| | | |
|---|---|---|
| ☑ | Electricity: | Direct billed by the provider. You pay the provider |
| ☑ | Gas/Heating Oil: | Direct billed by the provider. You pay the provider |
| ☑ | Water: | Allocated based on square footage & number of occupants. You will receive a bill from our billing vend |
| ☑ | Sewer: | Allocated based on square footage & number of occupants. You will receive a bill from our billing vend |
| ☐ | Central Boiler: | |
| ☑ | Cable: | Direct billed by the provider. You pay the provider |
| ☑ | Garbage Removal: | Allocated based on number of occupants. You will receive a bill from our billing vendor. |
| ☑ | Internet: | Direct billed by the provider. You pay the provider |
| ☑ | Pest: | Allocated equally among all occupied apartments. You will receive a bill from our billing vendor. |

# Exhibit E

11:43 5GUC 81

chrome-native://p

**CONSERVICE®**
The Utility Experts®

| Balance Inquiries & Payment Options | Customer Service | Service Problems with Utilities |
|---|---|---|
| Leasing Office: 1-818-888-5218 | Chat Us: www.utilitiesinfo.com<br>Toll Free: 1-866-947-7379 | Leasing Office: 1-818-888-5218 |

| | |
|---|---|
| **Account #:** | [redacted] |
| **Account Name:** | Ray Myllyla |
| **Due Date:** | 05/01/2024 |
| **Statement Date:** | 04/04/2024 |
| **Total Charges:** | $132.94 |
| **Service Address:** | [redacted] Woodland Hills, CA 91367 |
| **Web Pin:** | [redacted] |

**Average Utility Expense**




***Wash your fruits and vegetables in a pan of water instead of running water from the tap. You could then reuse it to water houseplants.***

## Utility Statement for Bella Vista

### CURRENT UTILITY CHARGES

| SERVICE TYPE | SERVICE PERIOD | CHARGES |
|---|---|---|
| Pest Control | 03/01/2024 - 03/31/2024 | $2.00 |
| Sewer | 03/01/2024 - 03/31/2024 | $25.60 |
| Trash | 03/01/2024 - 03/31/2024 | $59.90 |
| Trash Admin Fee | Conservice is a service provider contracted to prepare monthly statements and provide residents with conservation resources. | $4.67 |
| Water | 03/01/2024 - 03/31/2024 | $40.77 |
| **Current Charges due 05/01/2024** | | **$132.94** |

**Please see reverse for charge explanations and messages**

**CONSERVICE®**
The Utility Experts®

PO BOX 4717 LOGAN, UT 84323-4717
bl158

**Account #**.............................................[redacted] **Bella Vista**
**Amount Due**..........................................................**$132.94**
**Due Date** ..........................................................**05/01/2024**

*Past due amounts are not shown here. Your leasing office can check your ledger for overdue amounts and late fees.

Pay amount due to the leasing office by date specified. You might have a balance or additional charges through your community's leasing office that are not listed on this bill. For final amounts due, please check with the office.

RAY MYLLYLA
[redacted]

**Bella Vista**
6150 De Soto Ave
Woodland Hills CA 91367

e

| Service Type | Description |
|---|---|
| **Pest Control** | Your charges are based on a flat rate per unit for your pest control service. |
| **Sewer** | Sewer service is provided by Los Angeles Department of Water & Power and Los Angeles County Tax Collector. Service provider issues bill, property management pays a portion to cover common area usage. Remaining amount is paid by residents using a formula based on the number of occupants and the unit's square footage. |
| **Trash** | Trash service is provided by Waste Management National Services Inc 415. Your charges are based on a flat rate per unit for your trash service. |
| **Trash Admin Fee** | Trash billing service fee. |
| **Water** | Water service is provided by Los Angeles Department of Water & Power. Service provider issues bill, property management pays a portion to cover common area usage. Remaining amount is paid by residents using a formula based on the number of occupants and the unit's square footage. |

***Multiplier - A value of 1 has been assigned to the first occupant; add a value of .6 for the second, and add a value of .3 for each additional occupant on the lease.***

***This bill is not from your local utility provider or from any other provider.***

## Message Center

**Payment Options:**

Electronic Debit: You can authorize one-time or recurring electronic payments at www.my.equityapartments.com, Equity Residential's secure online resident portal.

Online Banking: When scheduling payment through your bank's bill system, choose Equity Residential as the payee and be sure to use your Equity Residential resident account number (available on the resident portal or by contacting your community's leasing office).

11:46 5GUC 80

chrome-native://p 11

CONSERVICE® The Utility Experts®

**Balance Inquiries & Payment Options** Leasing Office: 1-818-888-5218

**Customer Service** Chat Us: www.utilitiesinfo.com Toll Free: 1-866-947-7379

**Service Problems with Utilities** Leasing Office: 1-818-888-5218

| | |
|---|---|
| **Account #:** | [redacted] |
| **Account Name:** | Ray Myllyla |
| **Due Date:** | 10/01/2025 |
| **Statement Date:** | 09/20/2025 |
| **Total Charges:** | $231.38 |
| **Service Address:** | [redacted] Woodland Hills, CA 91367 |
| **Web Pin:** | [redacted] |

**Average Utility Expense**




***Store drinking water in the refrigerator rather than running the tap. This way, every drop goes into you and not the drain.***

## Utility Statement for Bella Vista

### CURRENT UTILITY CHARGES

| SERVICE TYPE | SERVICE PERIOD | CHARGES |
|---|---|---|
| Pest Control | 08/01/2025 - 08/31/2025 | $2.00 |
| Sewer | 08/01/2025 - 08/31/2025 | $40.32 |
| Trash | 08/01/2025 - 08/31/2025 | $96.94 |
| Trash Admin Fee | Conservice is a service provider contracted to prepare monthly statements and provide residents with conservation resources. | $4.67 |
| Water | 08/01/2025 - 08/31/2025 | $87.45 |
| **Current Charges due 10/01/2025** | | **$231.38** |

**Please see reverse for charge explanations and messages**

CONSERVICE® The Utility Experts®

PO BOX 4717 LOGAN, UT 84323-4717
bl158

**Account #** ............ [redacted] **Bella Vista**
**Amount Due** ............ **$231.38**
**Due Date** ............ **10/01/2025**

*Past due amounts are not shown here. Your leasing office can check your ledger for overdue amounts and late fees.

Pay amount due to the leasing office by date specified. You might have a balance or additional charges through your community's leasing office that are not listed on this bill. For final amounts due, please check with the office.

RAY MYLLYLA
[redacted]

**Bella Vista**
6150 De Soto Ave
Woodland Hills CA 91367

e

| Service Type | Description |
|---|---|
| **Pest Control** | Your charges are based on a flat rate per unit for your pest control service. |
| **Sewer** | Sewer service is provided by Los Angeles Department of Water & Power and Los Angeles County Tax Collector. Service provider issues bill, property management pays a portion to cover common area usage. Remaining amount is paid by residents using a formula based on the number of occupants and the unit's square footage. |
| **Trash** | Trash service is provided by Waste Management National Services Inc 415. Service provider issues bill, amount is allocated to residents using a multiplier based on the number of occupants in the unit. Your multiplier is 1.6. |
| **Trash Admin Fee** | Trash billing service fee. |
| **Water** | Water service is provided by Los Angeles Department of Water & Power. Service provider issues bill, property management pays a portion to cover common area usage. Remaining amount is paid by residents using a formula based on the number of occupants and the unit's square footage. |

***Multiplier - A value of 1 has been assigned to the first occupant; add a value of .6 for the second, and add a value of .3 for each additional occupant on the lease.***

***This bill is not from your local utility provider or from any other provider.***

## Message Center

**Payment Options:**

Electronic Debit: You can authorize one-time or recurring electronic payments at www.my.equityapartments.com, Equity Residential's secure online resident portal.

Online Banking: When scheduling payment through your bank's bill system, choose Equity Residential as the payee and be sure to use your Equity Residential resident account number (available on the resident portal or by contacting your community's leasing office).